DIVISION 1287, AMALGAMATED ASSOCIATION
OF STREET, ELECTRIC RAILWAY & MOTOR
COACH EMPLOYEES OF AMERICA ET AL. *v.*
MISSOURI.

No. 604.   Argued April 24–25, 1963.—Decided June 10, 1963.

*Bernard Dunau* argued the cause for appellants. With him on the briefs were *Bernard Cushman* and *John Manning*.

*Joseph Nessenfeld,* Assistant Attorney General of Missouri, argued the cause for appellee. With him on the brief were *Thomas F. Eagleton,* Attorney General of Missouri, and *J. Gordon Siddens* and *John C. Baumann,* Assistant Attorneys General.

*J. Albert Woll, Robert C. Mayer, Theodore J. St. Antoine* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging reversal.

Briefs of *amici curiae,* urging affirmance, were filed by *Richmond C. Coburn* and *Alan C. Kohn* for the Chamber of Commerce of Metropolitan St. Louis; by *James M. Douglas* for the Laclede Gas Company; and by *Irvin Fane, Harry L. Browne* and *Howard F. Sachs* for the Kansas City Power & Light Company.

Opinion of the Court by MR. JUSTICE STEWART, announced by MR. JUSTICE WHITE.

The appellant union is the certified representative of a majority of the employees of Kansas City Transit, Inc., a Missouri corporation which operates a public transit business in Kansas and Missouri. A collective bargaining agreement between the appellant and the company was due to expire on October 31, 1961, and in August of that year, after appropriate notices, the parties commenced the negotiation of an amended agreement. An impasse in these negotiations was reached, and in early November the appellant's members voted to strike. The strike was called on November 13.

The same day the Governor of Missouri, acting under the authority of a state law known as the King-Thompson

Act,[1] issued a proclamation that the public interest, health and welfare were jeopardized by the threatened interruption of the company's operations, and by an executive order purported to take possession "of the plants, equipment, and all facilities of the Kansas City Transit, Inc., located in the State of Missouri, for the use and operation by the State of Missouri in the public interest." A second executive order provided in part that "All rules and regulations . . . governing the internal management and organization of the company, and its duties and responsibilities, shall remain in force and effect throughout the term of operation by the State of Missouri."

Pursuant to a provision of the Act which makes unlawful any strike or concerted refusal to work as a means of enforcing demands against the utility or the State after possession has been taken by the State, the State petitioned the Circuit Court of Jackson County for an injunction on November 15, 1961.[2] A temporary restraining order was issued on that day, and the strike and picketing were discontinued that evening. After a two-day trial, the order was continued in effect, and the Circuit Court later entered a permanent injunction barring the continuation of the strike "against the State of Missouri."

---

[1] The King-Thompson Act is Chapter 295 of the Revised Statutes of Missouri, 1959. The section of the statute authorizing seizure is Mo. Rev. Stat., 1959, § 295.180.

[2] Missouri Rev. Stat., 1959, § 295.200, par. 1, provides:

"It shall be unlawful for any person, employee, or representative as defined in this chapter to call, incite, support or participate in any strike or concerted refusal to work for any utility or for the state after any plant, equipment or facility has been taken over by the state under this chapter, as means of enforcing any demands against the utility or against the state."

Section 295.200, par. 6, provides:

"The courts of this state shall have power to enforce by injunction or other legal or equitable remedies any provision of this chapter or any rule or regulation prescribed by the governor hereunder."

On appeal to the Supreme Court of Missouri, the appellants argued that the King-Thompson Act is in conflict with and is pre-empted by federal labor legislation, and that it abridges rights guaranteed by the First, Thirteenth, and Fourteenth Amendments. Reaffirming its earlier decisions in cases arising under the Act,[3] the Supreme Court of Missouri rejected these arguments and affirmed the issuance of the injunction. 361 S. W. 2d 33. We noted probable jurisdiction. 371 U. S. 961.

We are met at the threshold with the claim that this controversy has become moot, and that we are accordingly foreclosed from considering the merits of the appeal. The basis for this contention is the fact that, after the appellants' jurisdictional statement was filed in this Court, the Governor of Missouri issued an executive order which, although reciting that the labor dispute between Kansas City Transit, Inc., and the appellant union "remains unresolved," nevertheless terminated the outstanding seizure order, upon the finding that "continued exercise by me of such authority is not justified in the circumstances of the aforesaid labor dispute." Reliance for the claim of mootness is placed upon this Court's decisions in *Harris* v. *Battle,* 348 U. S. 803, and *Oil Workers Unions* v. *Missouri,* 361 U. S. 363. In the *Oil Workers* case the Court declined to consider constitutional challenges to the King-Thompson Act, and in the *Harris* case declined to rule on the constitutionality of a similar Virginia statute, on the ground that the controversies had become moot. In both of those cases, however, the underlying labor dispute had been settled and new collective bargaining agreements concluded by the time the litigation reached

[3] See *State ex rel. State Board of Mediation* v. *Pigg,* 362 Mo. 798, 244 S. W. 2d 75; *Rider* v. *Julian,* 365 Mo. 313, 282 S. W. 2d 484; *State* v. *Local No. 8–6, Oil, Chemical & Atomic Workers International Union,* AFL–CIO, 317 S. W. 2d 309, vacated as moot, 361 U. S. 363.

this Court. Here, by contrast, the labor dispute remains unresolved. There thus exists in the present case not merely the speculative possibility of invocation of the King-Thompson Act in some future labor dispute, but the presence of an existing unresolved dispute which continues subject to all the provisions of the Act. Cf. *Southern Pac. Terminal Co.* v. *Interstate Commerce Comm'n*, 219 U. S. 498, 514–516; *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 632. The situation here is thus quite different from that presented in the *Harris* and *Oil Workers Unions* cases, and we hold that the merits of this controversy are before us and must be decided.

The King-Thompson Act defines certain public utilities as "life essentials of the people" and declares it to be the policy of the State that "the possibility of labor strife in utilities operating under governmental franchise or permit or under governmental ownership and control is a threat to the welfare and health of the people." [4] The Act imposes requirements in connection with the duration and renewal of collective bargaining agreements,[5]

---

[4] § 295.010. "It is hereby declared to be the policy of the state that heat, light, power, sanitation, transportation, communication, and water are life essentials of the people; that the possibility of labor strife in utilities operating under governmental franchise or permit or under governmental ownership and control is a threat to the welfare and health of the people; that utilities so operating are clothed with public interest, and the state's regulation of the labor relations affecting such public utilities is necessary in the public interest."

[5] § 295.090. "All collective bargaining labor agreements hereafter entered into between the management of a utility and its employees or any craft or class of employees shall be reduced to writing and continue for a period of not less than one year from the date of the expiration of the previous agreement entered into between the management of the utility and its employees or if there has been no such previous agreement then for a period of not less than one year from the date of the actual execution of the agreement. Such

and creates a State Board of Mediation and public hearing panels whose services are to be invoked whenever the parties cannot themselves agree upon the terms to be included in a new agreement.[6] And where, as here, the recommendations of these agencies are not accepted, and the continued operation of the utility is threatened as a result, the Governor is empowered to "take immediate possession of" the utility "for the use and operation by the state of Missouri in the public interest."[7]

agreement shall be presumed to continue in force and effect from year to year after the date fixed for its original termination unless either or both parties thereto inform the other, in writing, of the specific changes desired to be made therein and shall also file a copy of such demands with the state board of mediation, at least sixty days before the original termination date or sixty days before the end of any yearly renewal period, or sixty days before any termination date desired thereafter."

[6] Mo. Rev. Stat., 1959, §§ 295.030, 295.070, 295.080, 295.120, 295.140, 295.160, 295.170.

[7] § 295.180. "1. Should either the utility or its employees refuse to accept and abide by the recommendations made pursuant to the provisions of this chapter and as a result thereof the effective operation of a public utility be threatened or interrupted, or should either party in a labor dispute between a utility and its employees, after having given sixty days' notice thereof, or failing to give such notice, engage in any strike, work stoppage or lockout which, in the opinion of the governor, will result in the failure to continue the operation of the public utility, and threatens the public interest, health and welfare, or in the event that neither side has given notice to the other of an intention to seek a change in working conditions, and there occurs a lockout, strike or work stoppage which, in the opinion of the governor, threatens to impair the operation of the utility so as to interfere with the public interest, health and welfare, then and in that case he is authorized to take immediate possession of the plant, equipment or facility for the use and operation by the state of Missouri in the public interest.

"2. Such power and authority may be exercised by the governor through such department or agency of the government as he may designate and may be exercised after his investigation and procla-

In *Bus Employees* v. *Wisconsin Board,* 340 U. S. 383, this Court held that the Wisconsin Public Utility Anti-Strike Law, which made it a misdemeanor for public utility employees to engage in a strike which would cause an interruption of an essential public utility service, conflicted with the National Labor Relations Act and was therefore invalid under the Supremacy Clause of the Constitution. The Supreme Court of Missouri in the present case rejected the appellants' argument that the *Wisconsin Board* decision was determinative of the unconstitutionality of the Missouri statute here in issue. The court held that the provisions of the King-Thompson Act dealing with the mediation board and public hearing panels were severable from the remainder of the statute, and refused to pass on any but those provisions which authorize the seizure and the issuance of injunctions against strikes taking place after seizure has been imposed. These provisions, the court ruled, do not—as in the *Wisconsin Board* case—provide a comprehensive labor code conflicting with federal legislation, but rather represent "strictly emergency legislation" designed solely to authorize use of the State's police power to protect the public from threatened breakdowns in vital community serv-

mation that there is a threatened or actual interruption of the operation of such public utility as the result of a labor dispute, a threatened or actual strike, a lockout or other labor disturbance, and that the public interest, health and welfare are jeopardized, and that the exercise of such authority is necessary to insure the operation of such public utility; provided, that whenever such public utility, its plant, equipment or facility has been or is hereafter so taken by reason of a strike, lockout, threatened strike, threatened lockout, work stoppage or slowdown, or other cause, such utility, plant, equipment or facility shall be returned to the owners thereof as soon as practicable after the settlement of said labor dispute, and it shall thereupon be the duty of such utility to continue the operation of the plant facility, or equipment in accordance with its franchise and certificate of public convenience and necessity."

ices. Emphasizing that the company was not a party to the injunction suit, the court concluded that, although the State did not actively participate in the management of the utility's operations, the Governor's executive order had been sufficient to convert the strike into one against the State, and that an injunction barring such a strike is therefore not barred by the provisions of federal labor legislation. 361 S. W. 2d, at 44, 46, 48–52.

We disagree. None of the distinctions drawn by the Missouri court between the King-Thompson Act and the legislation involved in *Wisconsin Board* seem to us to be apposite. First, whatever the status of the title to the properties of Kansas City Transit, Inc., acquired by the State as a result of the Governor's executive order, the record shows that the State's involvement fell far short of creating a state-owned and operated utility whose labor relations are by definition excluded from the coverage of the National Labor Relations Act.[8] The employees of the company did not become employees of Missouri. Missouri did not pay their wages, and did not direct or supervise their duties. No property of the company was actually conveyed, transferred, or otherwise turned over to the State. Missouri did not participate in any way in the actual management of the company, and there was no change of any kind in the conduct of the company's business. As summed up by the Chairman of the State Mediation Board: "So far as I know the company is operating now just as it was two weeks ago before the strike."

Secondly, the *Wisconsin Board* case decisively rejected the proposition that a state enactment affecting a public utility operating in interstate commerce could be saved from a challenge based upon a demonstrated conflict with

---

[8] 29 U. S. C. § 152 (2), (3), 49 Stat. 450; 61 Stat. 137–138. Compare *United States* v. *United Mine Workers*, 330 U. S. 258.

the standards embodied in federal law simply by designating it as "emergency legislation." There the Court said that where "the state seeks to deny entirely a federally guaranteed right which Congress itself restricted only to a limited extent in case of national emergencies, however serious, it is manifest that the state legislation is in conflict with federal law." 340 U. S., at 394.

The short of the matter is that Missouri, through the fiction of "seizure" by the State, has made a peaceful strike against a public utility unlawful, in direct conflict with federal legislation which guarantees the right to strike against a public utility, as against any employer engaged in interstate commerce.[9] In forbidding a strike against an employer covered by the National Labor Relations Act, Missouri has forbidden the exercise of rights explicitly protected by § 7 of that Act.[10] Collective bargaining, with the right to strike at its core, is the essence of the federal scheme. As in *Wisconsin Board,* a state law which denies that right cannot stand under the Supremacy Clause of the Constitution.

---

[9] In enacting the Taft-Hartley Act, Congress expressly rejected the suggestion that public utilities be treated differently from other employers. As explained by Senator Taft, "If we begin with public utilities, it will be said that coal and steel are just as important as public utilities. I do not know where we could draw the line. So far as the bill is concerned, we have proceeded on the theory that there is a right to strike and that labor peace must be based on free collective bargaining." 93 Cong. Rec. 3835.

[10] "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158 (a) (3)." 29 U. S. C. § 157, 49 Stat. 452; 61 Stat. 140.

It is hardly necessary to add that nothing we have said even remotely affects the right of a State to own or operate a public utility or any other business, nor the right or duty of the chief executive or legislature of a State to deal with emergency conditions of public danger, violence, or disaster under appropriate provisions of the State's organic or statutory law.

*Reversed.*