459 F.2d 968
 80 L.R.R.M. (BNA) 2290, 68 Lab.Cas. P 12,647
 AVCO CORPORATION, Appellant,
v.
LOCAL UNION #787 OF the INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW).
AVCO CORPORATION, Appellant,
v.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW).
 Nos. 71-1392, 71-1393.
 United States Court of Appeals,
Third Circuit.
 Argued March 20, 1972.
Decided May 5, 1972.
 
 Don A. Banta, Naphin, Banta & Cox, Chicago, Ill., for appellant.
 Sidney A. Simon, Williamsport, Pa., for appellee.
 Before ADAMS, GIBBONS and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 The pivotal question presented by this case is whether a district court may decline to issue a "Boys Markets"[1] injunction solely because the compulsory arbitration feature of a "no-strike" collective bargaining agreement is "employee oriented."[2]
 
 
 2
 The relevant facts underlying the controversy are not in dispute. On May 4, 1967, Avco Corporation (Avco) and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and its Local No. 787 (jointly referred to as the Union) entered into a collective bargaining agreement which contained, inter alia, a "no-strike" clause[3] and a broad compulsory arbitration clause.[4] In essence, the compulsory arbitration clause provides (1) that a grievance is "defined as any alleged violation of the terms of this Agreement or differences of opinion as to its interpretation or application," (2) that "any individual employee or group of employees shall have the right to present grievances to the Company at any time", (3) that in the event grievances are unresolved by resort to the mechanisms set forth in the agreement, the Union may refer the matter to the American Arbitration Association, and (4) that "[t]he decision of the arbitrator shall be final and binding upon the parties." Although the collective bargaining agreement regulated hours and wages, including overtime, it was silent whether Avco could require that employees work overtime, as defined therein.
 
 
 3
 The Avco plant in Williamsport, Pennsylvania, at the times in question, employed approximately 900 employees in the manufacture of aircraft engines. An additional 1500 employees had been laid off because of adverse economic conditions in the aerospace industry. Despite the lay-offs the nature of the products manufactured in Williamsport was such that in order to maintain proper production flow, overtime work was often required.
 
 
 4
 On April 2nd and 3rd, 1970, three employees refused requests to work overtime, and in due course, were disciplined by Avco. When internal grievance procedures failed to resolve the issue whether such discipline was proper, the matter was referred to arbitration. The arbitrator declined to sustain the discipline applied to these individual employees "in principal part, because the company has condoned such refusals in the past." This decision was reached "reluctantly" by the arbitrator because of the "possibility that the Union may be encouraged to adopt a hard attitude that will preclude a solution to the problem."
 
 
 5
 On February 21, 1971, the Union passed a resolution to the effect that the members would refuse overtime work until such time as the laid-off employees were rehired.[5] Avco was notified of the resolution, and when the employees refused to accept further overtime, Avco sought an injunction in the state courts. The cause was removed by the Union to the district court, which, after a hearing, denied the injunctive relief on the ground that compulsory arbitration clause was "employee-oriented".
 
 
 6
 * The first issue to be resolved is whether the district court erred in refusing to grant the injunction solely because the compulsory arbitration clause of the collective bargaining agreement was "employee-oriented". To decide this question, it is necessary to analyze Boys Markets and the cases leading up to it to determine whether such a criterion emerges from the reconciliation of federal labor policies.
 
 
 7
 Section 4 of the Norris-LaGuardia Act, 29 U.S.C. Sec. 104 (1970), barred the federal courts from issuing anti-strike injunctions, and thereby established the federal policy of non-interference in such matters. That statute was a response to federal courts which used the mechanism of the anti-strike injunction to undermine union organizational and bargaining efforts.[6] However, an equally strong policy to encourage the settlement of labor disputes through enforcement of compulsory arbitration agreements evolved in the 1950's and coexisted with the anti-strike injunction prohibition.[7] In 1962, the Supreme Court undertook the resolution of the conflict created by these policies, but instead of reconciling them, the Court decided the question by adopting a literal reading of Section 4. Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962). The effect of Sinclair was to hold that the earlier enacted Section 4 of the Norris-LaGuardia Act constituted an exception to Section 301 of the Labor-Management Relations Act, 29 U.S.C. Sec. 185 (1970), which vested jurisdiction in the district courts to entertain suits "for violation of contracts between an employer and a labor organization."
 
 
 8
 The Sinclair decision spawned a whole new set of conflicts between other policies. Prior to Sinclair, the Supreme Court had held that the purpose of Section 301 was to supplement the existing state jurisdictions over labor contract matters, and thus expand the number of available forums. Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). The Court also announced a need for uniformity among state and federal courts with respect to the enforcement of labor contracts. Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962). Thus, if the holding of Sinclair were limited to federal courts, uniformity would be destroyed, whereas if Sinclair were were applied to state courts, state jurisdiction would be divested, contrary to the congressional intent behind Section 301.[8] The Supreme Court side-stepped this problem in Avco Corp. v. Aero Lodge No. 735, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), but that decision, holding that a state action to enjoin a strike in violation of a "no-strike" clause could be removed to the federal courts, effectively precluded state courts from enforcing such provisions.
 
 
 9
 Against this backdrop, the Supreme Court reconsidered Sinclair in Boys Markets. There, the Court, noting that Avco Corp. v. Aero Lodge ran counter to Section 301 and effected "a wholesale dislocation in the allocation of judicial business between the state and federal courts," 398 U.S. at 246-247, 90 S.Ct. at 1590, concluded that it could either extend Sinclair to the states or overrule it. Since Congress had not intended that the Norris-LaGuardia Act apply to the states, and because the holding of Sinclair as applied to the states would have "devastating implications" for the enforceability of collective bargaining agreements, 398 U.S. at 247, 90 S.Ct. 1583, the Court chose to overrule Sinclair. Thus, it appears that the policy in favor of enforcing the settlement of labor disputes through compulsory arbitration emerged dominant. In explaining its deviation from the literal interpretation of the Norris-LaGuardia Act, the Supreme Court stated:
 
 
 10
 "The Sinclair decision, however, seriously undermined the effectiveness of the arbitration technique as a method peacefully to resolve industrial disputes without resort to strikes, lockouts, and similar devices. Clearly employers will be wary of assuming obligations to arbitrate specifically enforceable against them when no similarly efficacious remedy is available to enforce the concomitant undertaking of the union to refrain from striking. On the other hand, the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded-if anything, this goal is advanced-by a remedial device that merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration. We conclude, therefore, that the unavailability of equitable relief in the arbitration context presents a serious impediment to the congressional policy favoring the voluntary establishment of a mechanism for the peaceful resolution of labor disputes, that the core purpose of the Norris-LaGuardia Act is not sacrificed by the limited use of equitable remedies to further this important policy, and consequently that the Norris-LaGuardia Act does not bar the granting of injunctive relief in the circumstances of the instant case." 398 U.S. at 252-253, 90 S.Ct. at 1593-1594 (footnote omitted).
 
 
 11
 The Supreme Court specifically narrowed its holding to the situation where there existed a "no-strike" clause and where the strike was sought to be enjoined because it was over a grievance which both parties were bound to arbitrate. Id. at 253-254, 90 S.Ct. 1583.
 
 
 12
 Here, relying on Stroehmann Bros. Co. v. Local No. 427, 315 F.Supp. 647 (M.D.Pa.1970), the district court held that Avco and the Union "are not contractually bound to arbitrate the present dispute * * * since the procedure * * * was employee-oriented and since only the union had the right to institute action under the provisions of the agreement." 325 F.Supp. at 591.
 
 
 13
 We believe that this interpretation of the limitations of Boys Markets is far too restrictive. All that Boys Markets requires is that "both parties are contractually bound to arbitrate." 398 U.S. at 254, 90 S.Ct. at 1594, quoting 370 U. S. at 228, 82 S.Ct. 1328. It does not require that both parties be capable of initiating arbitration. In this case, the company is bound to arbitrate if the Union elects to pursue that remedy, and the Union is bound to arbitrate the disputes it desires to resolve rather than to resort to a strike. 398 U.S. at 248, 90 S.Ct. 1583.[9] The "no-strike" clause is the quid pro quo which Avco obtained for agreeing to submit to compulsory arbitration, and the Union agreed to forbear from striking in order to require such arbitration. To allow the Union to abandon its remedy of arbitration in order to disregard the "no-strike" clause would render the collective bargaining agreement illusory and would subvert the policy favoring the peaceful settlement of labor disputes by arbitration. To the extent Stroehmann Bros. holds otherwise, we disapprove of it.
 
 
 14
 The Union argues that granting the injunction in this case would be improper because it would amount to a judicial rewriting of the collective bargaining agreement. In support of this contention, the Union points to the second prayer of Avco's complaint, which reads:
 
 
 15
 "That your Honorable Court enter a decree, preliminary until hearing and perpetual thereafter, requiring Plaintiff to proceed with arbitration of the grievances which are set forth in the within Complaint, which are subject to adjustment and arbitration under the labor contract."
 
 
 16
 Thus, the Union concludes, to grant the injunction would be to permit Avco the right to initiate the arbitration, a right Avco allegedly relinquished when it negotiated the contract. Such an interpretation reads too much into the prayer. The grant of an injunction encompassing this request would not order that arbitration occur, but only that the Union not strike and that Avco submit to arbitration according to the contract if and when the Union chooses to pursue that remedy.
 
 II
 
 17
 The Union next urges that the denial of the injunction was proper because the underlying dispute was not subject to arbitration. It asserts that the contract is silent as to compulsory overtime, and that in any event, the prior arbitration established that employees need not accept such overtime if they so choose.
 
 However, we note that:
 
 18
 "To ensure maximum utilization of the arbitral process, the Supreme Court in United Steelworkers v. Warrior & Gulf Navigation Co. [, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960),] held that, when a party sought to compel arbitration in a suit under section 301 of the Labor-Management Relations Act, courts should resolve questions of interpretation of the arbitration clause by applying a strong presumption in favor of arbitrability. By making the presumption difficult to rebut the Court ensured that in virtually every case in which one party sought arbitration the dispute would be settled by the arbitrator. The presumption in favor of arbitrability applies even to the interpretation of contract provisions going to the scope of arbitral authority * * *." Note, Labor Injunctions, Boys Markets and the Presumption of Arbitrability, 85 Harv.L.Rev. 636, 637 (1972). See United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 584-585, 80 S. Ct. 1347, 4 L.Ed.2d 1409 (1960), accord, e. g., Procter & Gamble Indep. Union of Port Ivory, New York v. Procter & Gamble Mfg. Co., 298 F.2d 644, 645-646 (2d Cir. 1962).
 
 
 19
 In Warrior & Gulf, the Supreme Court stated:
 
 
 20
 "In the absence of any express provision excluding the particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where * * * the arbitration clause [is] quite broad." 363 U.S. at 584-585, 80 S.Ct. at 1354.
 
 
 21
 There are strong reasons supporting the federal policy in favor of arbitration. First, arbitrators are more competent than courts to interpret labor contracts and to resolve the problems of labor-management relations. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Second, the process of arbitration contributes to the maintenance of labor peace. United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 568, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Third, ordering arbitration is essential in effectuating the parties' contractual intent to settle disputes through arbitration. Fourth, a suit for damages rather than an injunction ordering arbitration "might not repair the harm done by the strike, and might exacerbate labor-management strife." Note, Labor Injunctions, Boys Markets, and the Presumption of Arbitrability, 85 Harv.L.Rev. at 638, citing, Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 248, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).
 
 
 22
 The prior arbitration here held the issue of compulsory overtime was properly subject to the arbitration provision, and this much of the arbitrator's decision might well constitute a form of res judicata precluding the Union from relitigating that narrow issue. See Local 616, IUE v. Byrd Plastics, Inc., 428 F.2d 23, 26 (3d Cir. 1970). But res judicata would not bar arbitration of the underlying dispute here because the other issues disposed of in the first arbitration are not identical with those which would face the arbitrator if this matter were before him. First, the arbitrator would have to decide whether the action taken by Avco with respect to the employees who refused overtime in April, 1970, effectively terminated the condonation upon which the first decision relied.9a If not, the arbitrator would then have to decide whether the first decision, framed in the context of individual action on the part of individual employees, applied to the concerted action of all employees. And in conjunction with that decision, the arbitrator would have to decide whether Avco had condoned in the past a concerted refusal to work overtime. Accordingly, the dispute was a proper subject matter for arbitration and was covered by the broad grievance procedure of the collective bargaining agreement.
 
 III
 
 23
 Finally, the Union claims that the order of the district court was proper because there was no strike to enjoin. The Union points out that employees are obligated to work only five consecutive eight-hour days, that there was no allegation that they did not do so, and that since the prior arbitration held that employees could refuse overtime, there has been no strike or work stoppage as contemplated under the terms of the "nostrike" clause. We believe that the Union construes this provision of the agreement too restrictively. In the contract, the Union agreed "that there shall be no strikes, walkouts, sit-downs, production retardings, or similar interruptions of, or interferences with, work during the term of this agreement for any reason * * *." Whatever may be the effect of individual decisions not to work overtime, in light of Avco's past reliance on overtime to meet its production demands, the resolution discouraging such overtime work is clearly an attempt by the Union to retard production, or to interrupt or interfere with work.[10]
 
 
 24
 As such, the Union's conduct falls within the proscriptions of the collective bargaining agreement, and is therefore proper subject matter for injunctive relief.
 
 IV
 
 25
 At oral argument it was suggested that this matter may have become moot because the parties have amended the collective bargaining agreement by adding the following provision:
 
 
 26
 "Neither the Union nor its members shall take any action to prevent any individual from working overtime."
 
 
 27
 Nevertheless, it is within the realm of possibility that at a later time, the Union could press its demand that laid-off employees be relieved, and punctuate this demand with another strike. If misconduct occurred in the past, and the possibility of its recurrence survives, a case is not moot. Pacific Maritime Assn. v. International Longshoremen's and Warehousemen's Union, 454 F.2d 262, (9th Cir. 1971); Atlantic Richfield Co. v. OCAW Int'l Union, 447 F.2d 945, 947 (7th Cir. 1971). See also, Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1968); Division 1287 of Amalgamated Ass'n of St., Elec. Ry. v. Missouri, 374 U.S. 74, 77-78, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963).
 
 
 28
 Of course, on remand the district court may consider the effect of the new contract provision in determining whether injunctive relief is appropriate.
 
 V
 
 29
 For all the reasons stated above, the order of the district court will be reversed, and the cause remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 The Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970)
 
 
 [2]
 Avco Corporation v. Local Union # 787, 325 F.Supp. 588 (D.C.Pa.1971). See Stroehmann Bros. v. Local No. 427, 315 F.Supp. 647 (M.D.Pa.1970)
 
 
 [3]
 "(a) The Union agrees that there shall be no strikes, walkouts, sitdowns, production retardings, or other similar interruptions of, or interferences with, work during the term of this agreement for any reason, except that the Union reserves the right to strike in the event that the parties fail to reach an agreement with respect to disputed job standards or rates to be paid on new operations following the exhaustion of the Third Step of the Grievance Procedure without regard to whether the grievance so filed and processed was a general, specific or policy grievance." The exception to this provision is not at issue here
 
 
 [4]
 The compulsory arbitration clause is reproduced at 325 F.Supp. at 590-591
 
 
 [5]
 A companion resolution that would have imposed a fine on employees who accepted overtime work was not approved
 
 
 [6]
 See The Supreme Court, 1969 Term, 84 Harv.L.Rev. 32, 200 (1970)
 
 
 [7]
 See Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). See generally, Isaacson, A Fresh Look at the Labor Injunction, Labor Law Developments 1971, 231, 234-235
 
 
 [8]
 See The Supreme Court, 1969 Term, 84 Harv.L.Rev. at 193
 
 
 [9]
 It is instructive that in limiting its holding in Boys Markets, the Supreme Court adopted the language of the dissent in Sinclair. And we note that the arbitration provision at issue in Sinclair is surprisingly similar to the provision sub judice here. Compare 370 U.S. at 250-253, 82 S.Ct. 1328 with 325 F.Supp. 590-591, n. 1. In both cases, only the Union could initiate the arbitration procedure
 9a This assumes that management at one time had the prerogative under the contract to require overtime work and subsequently lost that right through condonation. As indicated previously, condonation, although a "principal part" of the arbitrator's first decision, was not the sole basis of the award.
 
 
 [10]
 See First National Bank of Omaha, 171 NLRB No. 152, enforced, 413 F.2d 921 (8th Cir. 1969); Leprino Cheese Co., 170 NLRB No. 81, enforced, 424 F.2d 184 (10th Cir.), cert. denied, 400 U.S. 915, 91 S.Ct. 173, 27 L.Ed.2d 154 (1970); Valley City Furniture Co., 110 NLRB No. 216, enforced, 230 F.2d 947 (6th Cir. 1956); Meat Cutters, Local P. 575, 188 NLRB No. 2 (1971)