William SHEA, Michael McGuire, Michael Kelly, And All Other Persons Similarly Situated, Plaintiffs,

v.

WELLS FARGO ARMORED SERVICE CORP., Defendant.

No. 83 C 4564.

United States District Court, E.D. New York.

May 29, 1986.

O'Connor & Mangan, P.C. (J. Warren Mangan, of counsel), Long Island City, N.Y., for plaintiffs.

Akin, Gump, Strauss, Hauer & Feld (Richard N. Appel, Daniel Nash, of counsel), Washington, D.C. (Deborah Watarz, of counsel), New York City, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs brought this action against the defendant Wells Fargo Armored Service Corp. (Wells Fargo) for damages due to its alleged failure to pay accrued and unused sick and vacation pay for the period January 1, 1980 to April 1980. Plaintiffs assert jurisdiction on the basis of (a) diversity of citizenship, 28 U.S.C. § 1332(a)(1), (b) section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and (c) pendent jurisdiction. Wells Fargo moves for summary judgment.

Plaintiffs, members of Truck Drivers Local Union No. 807 I.B.T. (Local 807), allege the following. As of January 1, 1980 they had completed ten or more years of full-time service as employees with Wells Fargo, a Georgia corporation. Between March 14, 1977 and April 13, 1980, a collective bargaining agreement between Wells Fargo and Local 807 set forth the terms and conditions of plaintiffs' employment, including sick pay and vacation benefits.

The provisions for sick pay benefits entitled an employee to five sick days per year. The employee could either carry over unused sick days to the following year or receive payment for them at the prevailing rate at the time the unused days were accrued. An employee seeking payment for the unused sick days had to provide written notice to the employer by December 1 and would then receive payment during the first full pay period in December.

The provisions for vacation benefits entitled an employee to a specified number of paid vacation weeks based on seniority. In addition, certain employees on their fourth and ninth anniversaries were entitled to increased vacation pay, to be paid with their regular vacation pay during the following vacation season, or they could take additional weeks of vacation in the following year. An employee who worked less than twelve months during a given year would receive paid vacation time on a pro rata basis. The agreement then provides that "[i]n the event of termination of employment ... for any reason, vacation pay for service performed during the current year shall be prorated and shall be paid at the time of termination, together with all vacation pay earned [but not previously taken or paid for] for service during the entire preceding calendar year...."

On April 14, 1980 the members of Local 807, including plaintiffs, commenced a strike against Wells Fargo for a new collective bargaining agreement. On June 2, 1980 Wells Fargo withdrew recognition from Local 807. In June 1980, Local 807's Business Agent made repeated demands on Wells Fargo for payment of plaintiffs' ac-

crued and unused 1980 sick and vacation pay. The manager of the New York City branch of Wells Fargo and its executive vice president for operations assured the Business Agent and some of the plaintiffs that Wells Fargo would pay the benefits at the end of 1980. During July 1980, at the Business Agent's request, Wells Fargo paid plaintiffs their accrued and unused 1979 sick and vacation pay. Also in July 1980 Wells Fargo paid accrued and unused sick and vacation pay for the period January 1 to April 11, 1980 to another striking employee upon the termination of his employment.

On July 7, 1980 Wells Fargo hired permanent replacements for plaintiffs. On September 1, 1980 Wells Fargo distributed an employee handbook to certain employees setting forth the terms and conditions of employment (including vacation and sick pay benefits) effective July 7, 1980. Wells Fargo did not send plaintiffs a copy of the employee handbook, although they learned of its existence on September 1, 1980.

The employee handbook provides for three sick days per year following the completion of one full year of service. Unused sick days may not be accrued, but the employee is to receive payment for them no later than sixty days following the employee's anniversary date. The handbook also provides for paid vacation time based on seniority, but this time is not cumulative from year to year and must be taken within the year.

On December 21, 1980, Local 807 made a written demand on Wells Fargo on behalf of the plaintiffs for accrued and unused sick pay under the collective bargaining agreement. Wells Fargo rejected that demand by letter dated January 12, 1981 stating that plaintiffs were "former employees." On February 5, 1981, Local 807 demanded the 1980 pro rata vacation pay due under the agreement. On March 19, 1981 Wells Fargo stated that there were no vacation monies due to plaintiffs as "former employees."

On January 28, 1982, Local 807 served a notice of intention to arbitrate the issue of whether Wells Fargo failed to comply with the collective bargaining agreement by refusing to pay the accrued and unused sick and vacation pay for work performed during the period January 1, 1980 and April 11, 1980. In an award dated May 18, 1983, the arbitrator found that by "even the most liberal construction" the demand for arbitration was at least ten months too late and that therefore he was without authority to decide the merits of the sick and vacation pay dispute.

The complaint sets forth several theories of recovery. Wells Fargo's motion for summary judgment is addressed to all claims.

### A. *Claims Under the Collective Bargaining Agreement*

Plaintiffs assert that the collective bargaining agreement provided for severance payments of sickness and vacation benefits and thus established an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(1).

Wells Fargo argues that the vacation and sick leave benefits are not "employee welfare benefits" covered by ERISA, pointing out that the collective bargaining agreement did not provide for, and Wells Fargo never established, a separate fund for payment of vacation or sick pay.

ERISA defines an "employee welfare benefit plan" to include "any plan, fund, or program" established by the employer and maintained to provide beneficiaries, among other things, "benefits in the event of sickness, ... or unemployment, ... vacation benefits ..." and "any benefit described in section 186(c) of [Title 29]." 29 U.S.C. § 1002(1). Section 186(c) concerns, in pertinent part, money paid to trust funds "for the purpose of pooled vacation, holiday, severance, or similar benefits." 29 U.S.C. § 186(c)(6).

The regulations adopted by the United States Department of Labor (the Department) pursuant to ERISA interpret these sections to exclude from coverage certain "payroll practices," including payment "out of the employer's general assets" of (1) "an

employee's normal compensation" for time "absent for medical reasons" and (2) payment for time "while an employee is on vacation." 29 C.F.R. § 2510.3–1(b)(2)–(3).

One could read 29 U.S.C. § 1002(1) as broad enough to include the payments provided in the collective bargaining agreement for accumulated sick time and vacation time. That agreement arguably sets forth what might be termed a "plan" or "program" to provide "benefits" for sick days and vacation days. But, as noted, the Department has adopted the practical view that Congress did not intend to impose on an employer all the statute's filing and reporting requirements merely because the employer agreed to pay from general assets for ordinary vacation and sick time. The Department's views are entitled to weight, and other courts have paid deference to them. See, e.g., California Hosp. Ass'n v. Henning, 770 F.2d 856, 859–61 (9th Cir.1985); Scott v. Gulf Oil Corp., 754 F.2d 1499, 1502–03 (9th Cir.1985); Abella v. W.A. Foote Memorial Hosp., Inc., 740 F.2d 4, 5 (6th Cir.1984).

The concern with burdensome filing and reporting requirements which justifies excepting from ERISA a practice of ordinary payments for vacation and sick time is equally applicable to the common practice of paying for accumulated unused vacation or sick days, provided the employees are entitled to "earn" only a limited number of such days. Indeed, the Department has so ruled as to payment for accumulated unused sick days up to sixty, 1979 ERISA Opinion Letter No. 79–48A, and the Court of Appeals for the Sixth Circuit has sustained that interpretation. Abella v. W.A. Foote Memorial Hosp., Inc., supra, aff'g 557 F.Supp. 482 (E.D.Mich.1983). This court perceives no significant difference between the accumulation of a limited number of vacation days and the accumulation of a limited number of sick days.

There comes a point, of course, when the agreement for payment at termination for unused vacation days reasonably constitutes "severance" pay rather than a "payroll practice." An employee entitled to accumulate vacation days earned in many previous years may well look forward to the substantial amount accumulated as a part of "retirement" pay and count on it in making plans for the future. Thus the Department has ruled that a plan permitting an employee to accumulate vacation credits up to a career maximum of 104 vacation weeks provides for "severance" pay and is therefore an "employee welfare benefit plan" within the meaning of ERISA. 1981 ERISA Opinion Letter No 81–055A.

The case of Gilbert v. Burlington Industries, Inc., 765 F.2d 320 (2d Cir.1985), illustrates the same principle. There the employee manual provided for "payroll severance payments" and "vacation severance payments." The latter were based on the employee's length of continuous service "less vacation taken or adjusted." The amount paid on severance ranged up to twelve months salary. Though the employer paid this amount from general assets, the court held that the "plan" was covered by ERISA.

■ Under the collective bargaining agreement in the present case the employee was entitled to termination payment for vacation time accumulated only for the current and preceding year and could "carry over" five unused sick days only to the next calendar year. The potential amount at stake for an employee was not sufficiently significant to justify characterizing the payment due as out of the "ordinary" or as "severance" pay.

The court therefore holds that the collective bargaining agreement does not establish an employee welfare benefit plan governed by ERISA. Since there was no plan covered by ERISA, there was no violation of a fiduciary duty under such a plan. Plaintiffs can therefore assert their rights only under the agreement.

Plaintiffs withdrew their claim under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and their state law claims for violation of the collective bargaining agreement or for bad faith refusal to pay benefits are barred. Allis-

*Chalmers v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Local 174 Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).

### B. *Claims Under the Employee Handbook*

Plaintiffs also seek sick pay and vacation benefits under the employee handbook distributed on September 1, 1980. They assert claims for these benefits under ERISA and state contract law. The handbook does not entitle them to benefits. Wells Fargo never offered them employment under the handbook's terms and conditions.

### C. *Other Claims*

■ Plaintiffs also allege that Wells Fargo retaliated against them by refusing to pay their accrued vacation and sick pay benefits because plaintiffs rejected an offer of a successor collective bargaining agreement and commenced a strike. Essentially plaintiffs allege a violation by Wells Fargo of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1), which states that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in section 157 of [title 29] ...." Section 157 guarantees to employees the right "to engage in any ... concerted activities for the purpose of collective bargaining or other mutual aid or protection ...."

■ The right to strike as a means of collective bargaining is "the essence of the federal scheme" to regulate labor-management relations. *Division 1287, Amalgamated Association v. Missouri,* 374 U.S. 74, 78, 83 S.Ct. 1657, 1660, 10 L.Ed.2d 763 (1963). Neither state courts nor federal courts may entertain actions based upon alleged activities arguably constituting unfair labor practices under the NLRA. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 779–80, 3 L.Ed.2d 775 (1959).

■ Plaintiffs further claim fraud and misrepresentation, and refer to the statements in June 1980 by officers of Wells Fargo telling plaintiffs that it would pay their benefits at the end of 1980. Plaintiffs say they relied on these representations and thus did not timely exercise their rights under the collective bargaining agreement.

One element of a fraud claim is that the misrepresentation induced the plaintiff to act or to refrain from acting to his detriment. W. Prosser, *Law of Torts* 714 (4th ed. 1971). The arbitrator's decision shows that the reason plaintiffs failed to exercise their rights in time was not because they waited until the end of 1980 to take action but because, after Wells Fargo denied their demands for payment in December of 1980 and March of 1981, plaintiffs waited ten months to seek arbitration. The collective bargaining agreement required them to notify Wells Fargo within ten days of the denial of their intent to arbitrate, unless the parties agreed to extend the time. Even if Wells Fargo induced plaintiffs to wait until the end of 1980, this did not cause the loss of their rights. There is thus no claim in fraud.

Defendant's motion for summary judgment dismissing the complaint is granted. So ordered.