560 F.2d 1153
 95 L.R.R.M. (BNA) 3015, 82 Lab.Cas. P 10,027
 CEDAR COAL COMPANY, a corporation, Appellant,
v.
UNITED MINE WORKERS OF AMERICA, District No. 17, United Mine
Workers of America, Local Union No. 1766, United Mine
Workers of America, Charles R. Bollinger, Individually, and
as President of Local Union No. 1766, United Mine Workers of
America, Julian R. Morris, Individually, and as Chairman of
the Denny Division Mine Committee, Gilbert Hill,
Individually, and as Chairman of the Grace No. 2 Mine
Committee, Appellees,
Bituminous Coal Operators' Association, Inc., Amicus Curiae.
CEDAR COAL COMPANY, a corporation, Appellant,
v.
UNITED MINE WORKERS OF AMERICA, District No. 17, United Mine
Workers of America, Local Union No. 1759, United Mine
Workers of America, Hayes Holstein, Individually, and as
President of Local Union No. 1759, United Mine Workers of
America, Okey J. Johnson, Harold Hamrick, Individually, and
as members of the Grace No. 3 Mine Committee, David Forms,
Individually, and as Chairman of the Grace No. 3 Mine
Committee, Utah Clendenin, Jr., Ronald Roscoe Mullins,
Individually, and as members of the Coal Fork No. 1 Mine
Committee, Edward V. Massey, Individually, and as a member
of the Coal Fork No. 2 Mine Committee, Emmett G. Adkins,
Individually, and as Chairman of the Coal Fork No. 2 Mine
Committee, and Thomas L. Gibson, Individually, and as a
member of the Coal Fork No. 2 Mine Committee, Appellees,
Bituminous Coal Operators' Association, Inc., Amicus Curiae.
SOUTHERN OHIO COAL COMPANY, a corporation, and Ohio
Power Company, acorporation, Appellants,
v.
UNITED MINE WORKERS OF AMERICA, an unincorporated
association, District 31, United Mine Workers of America, an
unincorporated labor association, Local 1949, United Mine
Workers of America, an unincorporated labor association,
Lawrence Floyd, as president of District 31, United Mine
Workers of America, Ray Ashcraft, as president of Local
1949, United Mine Workers of America, John DeWitt, as
vice-president of Local 1949, United Mine Workers of
America, Sylvester Sartoris, as recording secretary of Local
1949, United Mine Workers of America, Kenneth Fisher, as
financial secretary of Local 1949, United Mine Workers of
America, and Willard Baker, as treasurer of Local 1949,
United Mine Workers of America, Appellees.
 Nos. 76-1785, 76-1793 and 76-1846.
 United States Court of Appeals,
Fourth Circuit.
 Argued Aug. 10, 1976.
Decided July 6, 1977.
 
 David D. Johnson, Charleston, W. Va. (Forrest H. Roles, Union, W. Va., Roger A. Wolfe, Jackson, Kelly, Holt & O'Farrell, Charleston, W. Va., on brief), for appellant in No. 76-1785 and No. 76-1793.
 Herbert G. Underwood, Clarksburg, W. Va. (Robert M. Steptoe, Jr., Steptoe & Johnson, Washington, D. C., on brief), for appellants in No. 76-1846.
 Guy Farmer (Farmer, Shibley, McGuinn & Flood, Washington, D. C., on brief), as amicus curiae for Bituminous Coal Operators' Association, Inc., in No. 76-1785 and No. 76-1793.
 Harrison Combs, Washington, D. C. (Ross Maruka, Fairmont, W. Va., on brief), for appellees in No. 76-1846.
 James M. Haviland, Washington, D. C. (Bruce Boyens, John Taylor, Charleston, W. Va., Richard M. Bank, Ellen P. Chapnick, Richard L. Trumka, Washington, D. C., on brief), for appellees in No. 76-1785 and No. 76-1793.
 Before WIDENER, Circuit Judge, LIVELY, Circuit Judge,* and MacKENZIE, District Judge.**
 WIDENER, Circuit Judge:
 
 
 1
 This appeal is a consolidation of three related cases. In all three, plaintiff coal companies sought damages and injunctive relief in the federal district courts against striking union locals. Relief was denied for various reasons and by various procedures. In each case the appellant is the coal company.
 
 
 2
 The facts of each case will first be discussed separately.
 
 
 3
 * Case No. 76-1793 involves Cedar Coal Company (Cedar) and the United Mine Workers of America, Local Union No. 1759 (Local 1759). Cedar is a West Virginia Corporation engaged in the production, preparation, and shipment of bituminous coal. Local 1759 is a local union which represents the employees who work at five mines owned by Cedar: Grace No. 3, Ridgeroad No. 5, Coal Fork Nos. 1 and 2, and Slaughter's Creek No. 1. Cedar and Local 1759 are signatories to the National Bituminous Coal Wage Agreement of 1974 which contains specific arbitration procedures, and, in Article XXVII, the following clause:
 
 
 4
 ARTICLE XXVII MAINTAIN INTEGRITY OF CONTRACT AND RESORT TO COURTS
 
 
 5
 The United Mine Workers of America and the employers agree and affirm that, except as provided herein, they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the "Settlement of Disputes" Article of this Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts.
 
 
 6
 Prior to June 1976, a dispute arose at Grace No. 3 mine over the meaning of Subparagraph III, (a)(7) of the 1974 Agreement:
 
 
 7
 "The Employer shall station a responsible employee on the surface to communicate at all times with the employees when they are at work underground."
 
 
 8
 The dispute was whether this provision required this job, the "responsible employee," be given to a member of the bargaining unit, and if so, whether the company was required to create a new bargaining unit job to be posted for job bidding under the collective bargaining agreement or whether the duty could be assigned as an additional duty to an employee holding an existing bargaining unit job. The parties submitted the dispute over the meaning of subparagraph (7) to arbitration. On June 3, 1976, the arbitrator decided the contract required Cedar to assign the job to a bargaining unit member, a decision vindicating the Union's position.
 
 
 9
 But perhaps because the arbitrator misunderstood the full scope of the dispute, he did not decide whether the provision required Cedar to create a new job and to post it for bidding by bargaining unit members. The dispute continued over this undecided issue and on June 22 employees at Grace No. 3 mine went on strike in support of their continuing demand that the company create and post a new job for bidding.
 
 
 10
 The District and Local Unions filed suit in the United States District Court on June 23, seeking injunctive relief to enforce the arbitrator's decision as they interpreted it, that is, as requiring a new job classification and posting. The hearing on the TRO-preliminary injunction against Cedar was scheduled for June 23, but because of a continuing jury trial, the district judge rescheduled the hearing for the following morning. The employees of Grace No. 3 returned to work on June 23, but apparently dissatisfied with the postponement of their case in the district court, the Union continued striking the following morning, June 24, when employees at all of Cedar's mines, whose employees were members of Local 1759, struck, and Local 1759 decided not to pursue further its request for injunctive relief in the courts although a hearing had been set. The record in that case discloses that it is still pending.
 
 
 11
 On June 24, Cedar suspended, subject to discharge, two employees of Grace No. 3 mine who allegedly instigated and encouraged the strike by picketing. The employees filed a grievance over the suspensions and the parties submitted the matter to arbitration. The arbitrator, on July 1, upheld the suspension of the two Grace No. 3 mine employees for two weeks without pay, but rejected their discharge as too severe. A protest over the suspension of these employees and a demand that the suspension be rescinded became additional reasons for the strike, which continued unabated.
 
 
 12
 Between June 26 and July 10, the strike was interrupted by the miners' regularly scheduled vacation. During this time, the arbitrator rendered a written decision on the posting issue which had been decided and delivered orally July 1. On July 9, he announced in writing that Cedar could assign the communications task to a bargaining unit member as an ancillary duty and did not have to post a new job for bidding by bargaining unit members.
 
 
 13
 On July 12, the first work day after vacation, Grace No. 3 and Coal Fork mines did not return to work, resuming the strike. The Coal Fork mines returned to work on July 13, but all Cedar employees (including those at the Coal Fork mines) represented by Local 1759 (and by Local 1766) resumed the strike on July 14 and remained continuously on strike to the time this appeal was heard.
 
 
 14
 On July 12, Cedar filed suit for injunctive relief and damages under § 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185. Cedar alleged that the unions and employees followed a "pattern and practice of refusing to submit . . . disputes . . . to peaceful settlement through grievance and arbitration procedures," that this pattern would continue, and that the present strike was over the arbitrator's rulings both as to the discharged employees and as to the job posting of the communication job. At the same time, Cedar moved for a preliminary injunction and a temporary restraining order. The TRO issued on July 13, to expire ten days later, and the hearing on the preliminary injunction was set for July 21. The employees protested the company's action in obtaining the restraining order and disputed the company's right to resort to the courts to enforce the arbitrator's decisions and the arbitration and implied no-strike provisions of the collective bargaining agreement. They indicated to Cedar's personnel manager that these actions were additional reasons for striking at all of the company's mines.
 
 
 15
 Although copies of the TRO were posted and served upon the employees, the strike continued and spread to other mines. At a hearing on civil contempt before the district court on July 16, two individual employee defendants were found guilty of contempt and fined $50 each. The judge imposed on the union a $25,000 per day coercive civil contempt fine and a $50,000 compensatory fine.
 
 
 16
 On July 20, Local 1759 filed a motion to vacate the TRO, emphasizing the three points to its position:
 
 
 17
 1. It argued the dispute was not arbitrable under Buffalo Forge Co. v. United Steelworkers of America, AFL-CIO, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), because the strike, it said, since at least July 18, was to protest federal labor injunctions and was in response to pickets from other locals who prevented employees from returning to work by "asking 'all UMWA miners to strike to stop the injunctions.' " Therefore, it argued the district court lacked jurisdiction for an injunction under the Norris-LaGuardia Act, 29 U.S.C. §§ 101-15.
 
 
 18
 2. It argued that because of threats of violence and the likelihood of personal injury created by an abnormally dangerous condition at the mine, the employees' refusal to return to work was not a strike under section 502 of the Labor Management Relations Act, 29 U.S.C. § 143, and therefore not enjoinable under 29 U.S.C. § 185.
 
 
 19
 3. Because the strike was not authorized by the defendant labor unions, it was a "wildcat" strike, and the unions could not be held responsible for it.
 
 
 20
 On July 22, Cedar suspended another three members of Local 1759 for picketing their own operations. According to an affidavit by Cedar's personnel manager, those discharges have since been an additional cause of the strike. The grievances filed in response to those suspensions are now pending before the arbitrator.
 
 
 21
 July 22 was also the day scheduled for the hearing on Cedar's preliminary injunction. But the attorneys for both parties were not available because of court appearances related to other litigation over the strike. The district judge therefore continued the hearing to July 27, and extended the TRO until that day. But on July 23 the judge continued the hearing indefinitely without stating any reasons. On that day, according to an affidavit of the personnel manager of Cedar, Hayes Holstein, the President of Local 1759 called him to say that at a Local meeting, 1759 decided to continue striking until four additional demands were met. These demands were:
 
 
 22
 1. That the UMWA receive justice equal with that given coal companies in the federal courts.
 
 
 23
 2. That the judges of the United States District Court for the Southern District of West Virginia be investigated to see whether they have been improperly influenced to side with coal operators against the UMWA.
 
 
 24
 3. That Cedar Coal Company dismiss and abandon all of its cases in federal courts, including all contempt actions, and further abandon and withdraw all contractual disciplinary action taken against any members of Local 1759, and
 
 
 25
 4. That all coal operators including Cedar pledge not to take any further legal or contractual actions against members of the UMWA for their actions relating to the strike.
 
 
 26
 Cedar applied for an injunction pending appeal under Rule 62 FRCP. The district court denied the motion, saying:
 
 
 27
 ". . . (A)lthough plaintiff may be entitled to such on the basis of the allegations in the verified complaint and the affidavit attached to the motion, such an injunction would not serve to end the strike; but would be unenforceable, and might aggravate and prolong the strike by further antagonizing the miners engaged in the strike."
 
 
 28
 Cedar then applied for an injunction pending appeal to the writer of this opinion, acting as a single judge under FRAP 8 "in an exceptional case where reference to a panel would be impracticable due to the requirements of time," who granted an injunction ordering Local 1759 to refrain from striking over any dispute concerning the arbitrator's decisions relating to the outside communication job or the discharge of the two employees.
 
 
 29
 Cedar now appeals the district court's continuance indefinitely of the hearing for a preliminary injunction, under 28 U.S.C. § 1292(a)(1).
 
 II
 
 30
 Case No. 76-1785 concerns another local union of the United Mine Workers of America within District 17, Local 1766, whose members are employees of Cedar Coal Company and are signatory to the National Bituminous Coal Wage Agreement of 1974. Members of Local 1766 work at Cedar's Denny Surface and Grace No. 2 mines.
 
 
 31
 On June 24, and 25, members of Local 1766 encountered pickets at the mouth of Slaughter's Creek Hollow, the main entrance to mines under the jurisdiction of Local 1766. Local 1766 employees did not cross the picket lines and did not report to work on those days. According to the Union, the pickets told members of Local 1766 that they were striking in protest of federal court injunctions in labor disputes. It is admitted that these initial pickets were from Local 1759.
 
 
 32
 After the regular annual vacation from June 26 to July 10, members of Local 1766 returned to work for two days. On July 14, pickets again appeared at the beginning of the work shifts. Local 1766 members did not report for work that day and have remained out up to the time of the argument of this case.
 
 
 33
 On July 20, Cedar filed suit against Local 1766, and the district and international unions, under 29 U.S.C. § 185. The complaint included allegations that the miners had for a long time followed a pattern and practice of refusing to submit arbitrable disputes to peaceful settlement through the arbitration procedures, and of engaging repeatedly in work stoppages instead. It also alleged a pattern and practice of the defendants to treat arbitrable disputes arising at any mine of any signatory operator as their own, as disputes between all employees and all signatory operators, and as directly involving the terms and conditions of employment of all employees at all mines. This strike, the complaint alleged, was over the arbitrator's rulings in the disputes of Local 1759.
 
 
 34
 Although a district judge of the court, as before recited, had entered a TRO restraining Local 1759 "and all persons acting in concert and participation with it, from continuing to engage in the strike," Local 1766 did not return to work. As a result, all of Cedar's mines served by Locals 1759 and 1766 were shut down and rendered idle.
 
 
 35
 Filed with Cedar's complaint against Local 1766 was a motion for a TRO. On July 20, the district judge denied the motion, giving three reasons:
 
 
 36
 1. Since the dispute originally arose between Cedar and Local 1759, it was not 1766's dispute even though they might profit from its resolution. As far as 1766 was concerned, it was, instead, a sympathy strike.
 
 
 37
 2. "I understand from Buffalo Forge, when they said that the Armco case was plainly wrong, or whatever the words were, it was my understanding that that meant that whether or not to cross a picket line was not an arbitrable issue and therefore they couldn't be compelled to cross a picket line," and
 
 
 38
 3. Whatever its original cause, the strike developed into protest over real or imagined wrongs by the federal courts.
 
 
 39
 After the court announced that it intended to rule against Cedar on the motion for a TRO, counsel for Local 1766 moved the court to dismiss the complaint for failure to state a claim upon which relief could be granted. The court granted the motion and dismissed the complaint, not just as against Local 1766 but as against all defendants.
 
 
 40
 Cedar immediately moved for an injunction pending appeal, which was denied, and then applied to the writer again, sitting as a single judge under FRAP 8, who denied the application, saying the outcome of the appeal in view of the recent Supreme Court case of Buffalo Forge Co. v. United Steelworkers of America, AFL-CIO, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), was not certain enough to warrant an injunction pending appeal.
 
 
 41
 Cedar, in case No. 76-1785, appeals the dismissal of its complaint for failure to state a claim upon which relief could be granted.
 
 III
 
 42
 Case No. 76-1846 involves employees of Southern Ohio Coal Company (Southern), a coal mining corporation in Marion County, West Virginia. Local 1949 is the labor organization representing Southern's production and maintenance employees working at the Martinka mine. Southern is a signatory to the National Bituminous Coal Wage Agreement of 1974 with the UMWA, of which defendants District 31 and Local 1949 are members.
 
 
 43
 A work stoppage at the Martinka mine began at 12:01 a. m., Monday, July 26, when employees met, at the access road to the mine, twelve to fifteen pickets who were passing out handbills reading as follows:
 
 
 44
 "UMWA STRIKE AGAINST INJUNCTIONS
 
 
 45
 "UMWA LOCAL UNION 1759, CEDAR COAL COMPANY HAS A FEDERAL INJUNCTION AGAINST THEM. THEY ARE BEING FINED $50,000 and $25,000 A DAY FOR STRIKING.
 
 
 46
 "WE ARE SICK AND TIRED OF THE FEDERAL COURTS TAKING THE SIDE OF THE COAL OPERATORS. HUNDREDS OF LOCALS ALL THROUGHOUT THE COAL FIELDS KNOW HOW UNJUST THE USE OF FEDERAL INJUNCTIONS ARE.
 
 
 47
 "ALL UMWA MINERS ARE ASKED TO STRIKE TO STOP THE INJUNCTIONS AND TO END ALL FINES AND SENTENCES.
 
 
 48
 "Paid by the UMWA members, Combined Miners,
 
 
 49
 Robert Nelson, Chairman"
 
 
 50
 Some of these pickets were drinking and some appeared to be drunk. The district court found the pickets were not members of Local 1949, but were UMWA members. In its oral opinion the court stated that the Southern employees "perhaps from fear or perhaps from exercise of a right not to cross picket lines, or perhaps for other reasons, respectful of the picket line and its meaning to them, . . . did not cross it either at the midnight shift or at the 8:00 a. m. (shift)." It went on to find that the resulting work stoppage was "one of failure to cross a picket line maintained by others than the members of this particular local union."
 
 
 51
 On July 26, Southern filed suit against District 31 and Local 1949 in the district court under 29 U.S.C. § 185, asking for damages and injunctive relief. The complaint alleged that the work stoppage was the result of refusal to cross a picket line, and took the position that this was a dispute resolvable under the arbitration provisions of Article XXIII of the collective bargaining agreement. The complaint further alleged that defendants refused to submit the matter to arbitration, and that they "engaged in a willful and deliberate pattern of refusing and avoiding compliance with the arbitration and grievance procedures," resorting instead to work stoppages, a conclusion based on fifteen other work stoppages by this local and district under the 1974 contract. There was nothing to indicate, the complaint continued, that such past pattern would not continue. But, after evidence was taken, plaintiffs' counsel conceded that there had been no refusal to arbitrate. Just as importantly, although given the opportunity, the union did not agree to arbitrate without concurrently striking, although arbitration was demanded.
 
 
 52
 Motions for a preliminary injunction and TRO accompanied the complaint. At a hearing on both,[1] the district court took testimony and then denied the motions, relying on Buffalo Forge v. United Steelworkers of America, AFL-CIO, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). Southern then appealed from the denial of injunctive relief and applied for an injunction pending appeal. As with Locals 1759 and 1766, Local 1949 had remained on strike until the argument of those cases with this one.
 
 
 53
 After the case was argued on the issue of an injunction pending appeal, we inquired of the parties if the issue of the denial of a preliminary injunction should be decided now, rather than deferring the matter, and they graciously agreed and filed additional authorities, all recognizing that that issue had to follow regardless of the outcome of a ruling on the injunction pending appeal.
 
 IV
 
 54
 We may not close our eyes to the fact freely argued by the parties that the strike which commenced with the grievance of Local 1759 spread to affect at least a substantial part of the bituminous coal industry. It has since ceased and we have received additional briefs on mootness.
 
 V
 
 55
 In case No. 76-1785 concerning Local No. 1766 et al., the unions take the position that the order dismissing the complaint is not an appealable order under 28 U.S.C. § 1291.
 
 The full text of the order is as follows:
 
 56
 "On motion of the defendants under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it is hereby ordered that plaintiff's complaint be, and it hereby is, dismissed with prejudice for failure to state a claim upon which relief can be granted. " Enter: This 20 day of July, 1976."
 
 
 57
 The gist of the unions' argument is that, because the order dismisses the complaint, rather than adjudicates, and might leave room open for later amendment, it is not an appealable order within the contemplation of § 1291. We do not agree. Not only does the transcript indicate that the order was intended to be in all respects final, we think an order dismissing a complaint with prejudice for failure to state a claim upon which relief can be granted, with no mention of amendment, and no attempt at amendment shown in the record, is a final appealable order under § 1291.
 
 VI
 
 58
 In case No. 76-1793 concerning Local No. 1759 et al., the unions contend that the indefinite continuance of the motion for a preliminary injunction is not a denial of injunctive relief and thus is not an appealable order under 28 U.S.C. § 1292(a)(1).
 
 
 59
 It must be remembered that the temporary restraining order issued by the court was to expire on July 23rd and that the hearing on the preliminary injunction had been set for July 22nd but was not heard on motion of the unions because the attorneys for both sides were not available due to court appearances related to other litigation concerning the strike. On that account, the court had continued the hearing on the preliminary injunction to July 27th and had extended the TRO until the 27th. But on July 23rd the judge continued the hearing on the preliminary injunction indefinitely, that is to say "until the further order of . . . (the) court," stating no reason, and the matter has never been heard, although it was bound to have been brought to his attention by the application for an injunction pending appeal which was asked for in that court. So the failure to hear the motion for the preliminary injunction cannot be taken as inadvertence; rather, it may only be construed as a conscious denial of a hearing on the motion for a preliminary injunction and a similarly conscious allowing of the expiration of the TRO.
 
 
 60
 We hasten to add that by use of the word "conscious," we attribute no improper motive to the district judge, rather using the word to distinguish between acts which are voluntary on the one hand and inadvertent on the other.
 
 
 61
 We think the indefinite continuance amounted to the refusing of an injunction and is appealable as such under 28 U.S.C. § 1292(a). In indistinguishable circumstances, the Fifth Circuit has held such action appealable in United States v. Lynd, 301 F.2d 318 (5th Cir. 1962), and noted the holding with approval in Kennedy v. Lynd, 306 F.2d 222, 229, n. 3 (5th Cir. 1962). See also McCoy v. Louisiana, etc., 332 F.2d 915 (5th Cir. 1964). We follow those precedents. See also Wright and Miller, Federal Practice and Procedure, Vol. 11, § 2962. Were an appeal not allowed under the facts as they are presented to us in this case, it would permit a plain denial of even the bare consideration of whether to consider injunctive relief to go unaccounted for by virtue of an indefinite continuance. We are aware, of course, that the mere expiration of the TRO gives no ground for appeal. See Wright and Miller, supra.
 
 
 62
 Since we treat the district court's action as the refusal of a preliminary injunction, the question before us is whether the refusal was an abuse of discretion.
 
 VII
 
 63
 The next defense the unions assert to these cases is that they are moot so far as the injunctive aspects of them are concerned. It is not contended that the damages question in case No. 76-1785 (Local 1766) is moot.
 
 
 64
 Their principal argument is that the mootness issue is controlled by Oil Workers Local 8-6 v. Missouri, 361 U.S. 363, 80 S.Ct. 391, 4 L.Ed.2d 373 (1960), which followed Harris v. Battle, 348 U.S. 803, 75 S.Ct. 34, 99 L.Ed. 634 (1954).
 
 
 65
 In our case, the strike ended after the argument of the case and the day before a hearing for Local 1759 on a civil contempt citation before this court.
 
 
 66
 We think the cases are not moot, it being remembered that the questions before us in No. 76-1793 (Local 1759) and No. 76-1846 (Local 1949) are the denials of preliminary injunctions, while the question before us in No. 76-1785 (Local 1766) is the denial of any relief, temporary restraining order, preliminary or permanent injunction, or damages.
 
 
 67
 We begin with proposition that mootness is a jurisdictional question going to the existence of a case or controversy under Article III of the Constitution. The rule is stated in North Carolina v. Rice, 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971), that courts are not empowered to decide moot questions or abstract propositions, but the exercise of judicial power depends upon the existence of a case or controversy. The suit must be definite and concrete, touching the legal relations of parties having adverse legal interests and be a real and substantial controversy admitting of specific relief through a decree of conclusive character as distinguished from an opinion of what the law would be upon a hypothetical statement of facts.
 
 
 68
 Neither side would take exception, we think, to the just stated proposition. The unions, however, claim that under Oil Workers these cases are required to be moot because the strike has ended. In that case, the State of Missouri seized, under a Missouri statute, a public utility which had been the subject of a strike by the union. After the seizure, the State procured an injunction against the strike in a State court, and the strike terminated a day later. A month after that, a new collective bargaining agreement was signed, and two months later, the governor ended the seizure. During the course of the litigation, the injunction had expired by its own terms. The Court held the case moot, stating that a judgment at that late date would be wholly ineffectual for want of a subject matter on which to operate, and an affirmance would ostensibly require something to be done which had already taken place, while a reversal would ostensibly avoid an event which had already passed beyond recall.
 
 
 69
 The Oil Workers opinion did not discuss Southern Pacific Terminal v. ICC, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), stating that the application of that case to a similar fact situation had been rejected in Harris v. Battle, 348 U.S. 803, 75 S.Ct. 34, 99 L.Ed. 634 (1954). Oil Workers differs from our case in that there a new collective bargaining agreement was signed which had removed the cause for the strike. Here, the same collective bargaining agreement is present. In Oil Workers, the Court said that adjudicating the merits would be an adjudication of a cause which no longer exists. In our case, as we show, the controversy is very much alive.
 
 
 70
 Oil Workers, however, was followed by Bus Employees v. Missouri, 374 U.S. 74, 83 S.Ct. 1657, 10 L.Ed.2d 763 (1963), which involved the validity of the same Missouri statute at issue in Oil Workers. In Bus Employees, the governor had seized a bus company under the same statute utilized in Oil Workers. After the filing of the jurisdictional statement in the Supreme Court, the governor, however, terminated the seizure order, leaving the labor dispute unresolved. The Court held the case was not moot and distinguished Oil Workers because in Oil Workers the underlying dispute had been settled and a new collective bargaining agreement had been executed. The Court added that there existed in Bus Employees not merely the speculative possibility of the invocation of the statute in some future labor dispute, but the presence of an existing unresolved dispute which continued subject to all the provisions of the statute involved. The report does not indicate whether or not the strike which had previously been enjoined by a State court in Missouri started up again after the executive order of the governor dissolving the seizure order.
 
 
 71
 In arriving at our conclusion, we have kept in mind the anti-injunction policy of the Norris-LaGuardia Act and that we should avoid the at-largeness which brought it on. See Sinclair Refining Company v. Atkinson, 370 U.S. 195, 215, 219, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962) (Mr. Justice Brennan dissenting). We have also been mindful of the often repeated admonition that we should not lend ourselves to becoming potential participants in a wide range of arbitrable disputes under existing and future collective bargaining agreements for the purpose of preliminarily dealing with the merits of the factual and legal issues that are subjects for the arbitrator. See Buffalo Forge Co. v. United Steelworkers of America, AFL-CIO, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). As stated in Buffalo Forge, p. 409, 96 S.Ct. 3141, there is no general federal anti-strike policy, and the Supreme Court has never indicated that the courts may enjoin actual or threatened contract violations despite the Norris-LaGuardia Act, which of course is subject to Boys Markets, Inc. v. Retail Clerks Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).
 
 
 72
 The mootness doctrine is nothing new, and years ago, in Southern Pacific Terminal, the Court held a controversy not moot which was capable of repetition, yet evading review. In that case, the Interstate Commerce Commission had issued an order to cease granting one Young an undue rate preference for a period of not less than two years. The period as extended had expired prior to the hearing of the case by the Supreme Court. The Court recited the mootness rule as that when "pending an appeal, something occurs, without any fault of the defendant, which renders it impossible, if our decision should be in favor of the plaintiff, to grant him effectual relief, the appeal will be dismissed." P. 514, of 219 U.S., p. 283 of 31 S.Ct. It stated that in such cases the acts sought to be enjoined had been completely executed and there was nothing that the judgment of the court could have effected. A part of the reasoning was that the ICC usually operated by continuing orders and that it ought not to be able to defeat, by short term orders issued from time to time, the judicial construction of its orders which affected both the government and a carrier. The Court also mentioned the rights of the public which the government had endeavored to procure by the judgment of a court. Following Southern Pacific Terminal, numerous cases have considered the "capable of repetition, yet evading review," rule. The ones which immediately concern us are Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), and Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975). Sosna did not involve a labor union, rather holding not moot a claim contesting the validity of an Iowa divorce residency statute where a class of plaintiffs had been certified although the named plaintiff had completed her residency and, indeed, been divorced elsewhere. The significance of Sosna to this opinion is that it is construed in Weinstein v. Bradford (a prisoner's rights case) in the context of application of the "capable of repetition, yet evading review," doctrine. The doctrine is there construed as limited to a situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again. The second part of that standard is not substantially different from the one applied by us only shortly before in Linkenhoker v. Weinberger, 529 F.2d 51, 52-53 (4th Cir. 1975).
 
 
 73
 The complaint in case No. 76-1785 (Local 1766) charges that the unions have for a long time past followed a pattern and practice of refusing to submit arbitrable disputes or differences to peaceful settlement through the grievance and arbitration procedures provided by said contracts and have repeatedly engaged in strike and work stoppages with an object to forcing and requiring Cedar and other signatory operators to settle such disputes and differences in accordance with the demands of the unions and in violation of said contracts. It also charges that since the effective date of the collective bargaining agreement, the unions had repeatedly threatened and engaged in strikes and work stoppages with an object to forcing and requiring Cedar and other signatory operators to settle differences and disputes which are required to be settled under the terms of the collective bargaining agreement by the grievance and arbitration procedure in accordance with the demands of the unions. The complaint also charges that there is, and has been for many years, a pattern and practice of the unions to treat and consider arbitrable disputes and differences arising at any and all mines of signatory operators covered by the collective bargaining agreement as their own, and to adopt as their own and as matters directly involving their own self-interest any and all disputes and differences arising at any mine of any operator signatory to said collective bargaining agreement, to engage in strikes and work stoppages in connection therewith in derogation of the collective bargaining agreement grievance procedures in order to coerce the operators into interpreting, applying, and administering the terms and provisions of the collective bargaining agreement favorably to the unions. The complaint further charged that the unions engaged in a strike over and in protest of the arbitrator's rulings with respect to the job posting dispute and consequent discharges which we remember took place in the mines served by Local 1759, the sister union of Local 1766.
 
 
 74
 The complaint alleges irreparable injury and damages and prays for injunctive relief to halt the strike, to require the present dispute to be submitted to arbitration, to require future arbitrable disputes to be submitted to arbitration, and for damages.
 
 
 75
 The complaint in case No. 76-1793 (Local 1759) alleges that the unions had for a long time past followed a practice of refusing to submit local or district disputes or differences at plaintiff's mines or related facilities to peaceful settlement through the grievance and arbitration procedures provided by the collective bargaining agreement but had repeatedly engaged in strikes and work stoppages with an object to forcing and requiring plaintiff to settle such disputes and differences in accordance with the demands of the unions. It is alleged they continue such pattern and practice. The complaint then alleges the disputes over the outside communications job and the discharge of the two employees, with the resulting arbitrator's awards and the resulting strike over the awards.
 
 
 76
 The complaint alleges that Cedar has been and now is ready, willing, and able to submit to arbitration any and all matters giving rise to the dispute and work stoppage. It alleges irreparable injury and prays for injunctive relief to halt the strike, to submit the present disputes to arbitration, to submit future arbitrable disputes to arbitration, and for damages.
 
 
 77
 In case No. 76-1846 (the Southern Ohio and Local 1949 case), the verified complaint was in two counts. The first count alleged a work stoppage as a result of the refusal to cross the picket line previously described, the members of which picket line being later found by the district court to be members of the UMWA but not of Local 1949. It alleged that Southern Ohio was ready, willing, and able to arbitrate the dispute of whether or not the Local 1949 members had to cross the picket line, irreparable injury, and damages.
 
 
 78
 The second count repeated the allegations of the first count and added that there was a likelihood that the unions might repeatedly and willfully engage in work stoppages in specific disregard of the collective bargaining agreement's provisions in that under the existing 1974 agreement there had been a total of 15 work stoppages or strikes previous to the existing strike, which had resulted in the loss of in excess of 5,000 man days of work. The complaint alleged a willful and deliberate pattern of refusing and avoiding compliance with the arbitration procedures of the collective bargaining agreement, and resorting instead to the economic pressure of strike and work stoppages for the purpose of coercing accession to demands of the unions which were subject to the arbitration procedures of the collective bargaining agreement. It alleged that Southern Ohio was and had been ready, willing, and able to arbitrate the disputes but that the unions had refused so to do. The complaint charged that the continuing resort to strikes rather than to arbitration would likely continue into the future.
 
 
 79
 The complaint, as to the first count, prayed for injunctive relief to stop the strike, to submit the dispute to arbitration, and to take such further action as might be necessary to comply with the collective bargaining agreement. As to the second count, the complaint prayed for injunctive relief to stop the strike, to submit present and future arbitrable disputes to arbitration, and to take action necessary to assure compliance with the terms of the collective bargaining agreement. Damages were asked for under the first count.
 
 
 80
 In ascertaining whether these cases are moot, because the complaint was dismissed in No. 76-1785 (Local 1766), the allegations of the complaint must be taken as true. Kossick v. United Fruit Co., 365 U.S. 731, 732, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). We think the same principle must apply in case No. 76-1793 (Local 1759), where the district court, by its indefinite continuance, denied injunctive relief without a hearing which deprived Cedar of any chance to present facts other than those alleged in the complaint as surely as if the case had been dismissed. A similar principle, albeit somewhat different, should apply in case No. 76-1846 (Local 1949). In the case concerning Local 1949, a hearing was held, so we should consider both the allegations of the verified complaint and the facts shown at the hearing should they be different from the complaint in any essential element, which they are not.
 
 
 81
 It is, of course, admitted by all that the strike ended during the pendency of this appeal and only a short while after the argument of the cases. It is therefore apparent that the first element of the test in Weinstein was met, that is to say, the challenged actions in each case were in their duration too short to be fully litigated prior to their cessation or expiration. The challenged action of each of the unions is its strike which ended prior to the time it was fully litigated.
 
 
 82
 In case No. 76-1785 (Local 1766), Cedar has alleged that the unions have followed a pattern and practice of refusing to submit arbitrable disputes or differences to peaceful settlement through the grievance and arbitration procedures provided by the collective bargaining agreement, and that they have repeatedly engaged in strikes and work stoppages with an object to forcing and requiring Cedar to settle such disputes in accordance with the demands of the unions rather than through arbitration as required by the collective bargaining agreement. Cedar also charges a pattern and practice of treating and considering arbitrable disputes and differences arising at other mines of signatory operators covered by the collective bargaining agreement as their own and adopting the same as matters involving their own self interest, and to that end engaging in strikes and work stoppages in connection with such disputes in violation of the collective bargaining agreement grievance procedures.
 
 
 83
 In case No. 76-1793 (Local 1759), Cedar has alleged that the unions had for a long time past followed a practice of refusing to submit local disputes and differences to settlement through the grievance and arbitration procedures provided by the collective bargaining agreement and that they had repeatedly engaged in strikes and work stoppages with an object to forcing and requiring Cedar to settle such disputes and differences in accordance with the demands of the unions rather than through the grievance procedures provided by the collective bargaining agreement. Cedar alleges they continue such pattern and practice and that the strike under consideration is an example.
 
 
 84
 In case No. 76-1846 (Local 1949), Southern Ohio alleges a willful and deliberate pattern of refusing and avoiding compliance with the arbitration and grievance procedures and instead a resort to the economic pressure of strikes and work stoppages for the purpose of coercing accession by Southern to demands of the unions instead of subjecting the disputes to the arbitration procedures of the collective bargaining agreement. It alleges that the unions not only have failed and refused to subject the present dispute, which it says is arbitrable, to the grievance procedure of the collective bargaining agreement, but that the unions have, under the present agreement, engaged in 15 strikes over arbitrable issues instead of arbitrating them, and it alleges this pattern is likely to continue.
 
 
 85
 Cedar invites us to consider its affidavits filed with its applications for injunctions pending appeal in the ascertainment of whether or not these cases are moot. We think they may be considered in ascertaining whether the cases are moot, although they should not be considered in ascertaining the merits. This is so because there was no mootness question before the district court, so we are not reviewing that. Rather, we are deciding whether the cases are now moot, and just as the end of the strike during the pendency of the appeal is a fact which we should consider in deciding the mootness question, we should also consider other undisputed relevant facts. As we have stated, mootness as we consider it here arises when "something occurs" "pending an appeal." Southern Pacific Terminal, 219 U.S. p. 514, 31 S.Ct. 279. One affidavit filed by Cedar with respect to Locals 1759 and 1766 shows that there have been 15 strikes by Cedar employees and local unions under the 1974 agreement over arbitrable issues; that 7 of those strikes were engaged in by employees at mines other than the mine at which the dispute causing the strike arose, as well as by the employees at the mine where the dispute arose. The other affidavit shows there have been 26 strikes by Cedar employees and local unions under the 1974 agreement, 12 of which were engaged in by employees at more than one of the company's mines, and all of the 12 strikes were engaged in by employees in both Locals 1759 and 1766. While these affidavits may seem, on their face, to possibly be somewhat inconsistent, they are not necessarily so, which further points out the difficulty caused by the district courts' failures to grant hearings in either of these proceedings. These facts in all events are essentially undisputed by the unions as they may relate to our examination of the mootness question.
 
 
 86
 We think the allegations of a pattern and practice of strikes over arbitrable issues instead of resorting to the grievance procedures of the contract, coupled with the allegations in these three cases, of repeated specific instances of striking over such issues rather than arbitrating, are facts sufficient to show that there was a reasonable expectation that the same complaining parties (Cedar and Southern Ohio) would be subjected to the same action again, and thus that the second condition of the doctrine as set out in Weinstein has been complied with.
 
 
 87
 In this context, we note that in at least two cases the Supreme Court has noted, in cases involving labor relations and strikes, that a factor to be considered is that ". . . authorizing the issuance of a temporary injunction, as is frequently true of temporary injunctions in labor disputes, may effectively dispose of . . . (litigants) rights and render entirely illusory his right to review . . . (in the Supreme Court) as well as his right to a hearing before the Labor Board." Liner v. Jafco, Inc., 375 U.S. 301, 308, 84 S.Ct. 391, 395, 11 L.Ed.2d 347 (1964). That principle was alluded to in Liner in holding a case not moot in an appeal by a union. The same principle was relied on in Super Tire Engineering Company v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), and especially as that case was construed in Weinstein, 423 U.S. p. 148, 96 S.Ct. 347. The principle quoted from Super Tire in Weinstein, at p. 148, 96 S.Ct. at p. 348, is that " 'the great majority of economic strikes do not last long enough for a complete judicial review of the controversies they enqender,' " see Super Tire, 416 U.S. 125-126, 94 S.Ct. 1694.
 
 
 88
 The unions next argue that even if the issue is one properly framed as capable of repetition, yet evading review, that the cases only allow this view of mootness when a governmental interest is involved. See Super Tire, p. 122, 94 S.Ct. 1694. We think this position is a too narrow view of the mootness doctrine. As a matter of principle, we doubt that a court is any less obliged to do justice between man and man than between citizen and sovereign. It is true that in the cases involving governmental entities, there will ordinarily be a policy, statute, or regulation which, unless not revoked or repealed, will continue to exist and which may indeed make more likely a repetition of the event which brought on the controversy in question. Super Tire phrases it as a brooding presence. But the Supreme Court, in Carpenters Union v. National Labor Relations Board, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), in note 2, has applied the rule of United States v. W. T. Grant, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), to a dispute between companies and unions before the Labor Board over the hot cargo provisions of union contracts. The "sole question" in that case was whether the hot cargo provisions of the collective bargaining agreements involved amounted to an unfair labor practice in violation of 29 U.S.C. § 158(b)(4)(A). The W. T. Grant holding applied in the Carpenters Union case was that the case was not moot since the court could not say there was no danger of recurrent violation. No analysis of mootness in a case involving a labor dispute would be complete without the consideration of Buffalo Forge at note 8. In that case, the sympathy strike of a production and maintenance union took the form of those employees refusing to cross a picket line established by office and technical workers. Although the dispute between the office and technical workers and the company continued, the production and maintenance employees' sympathy strike had ended prior to the hearing of the case, but the strike might have been "resumed at any time in the near future at the direction of the International Union, or otherwise." 428 U.S. at 403, 96 S.Ct. at 3145. The court held the case was not moot despite the return of the production and maintenance employees to the job, relying on Super Tire and Bus Employees. It stated that "(t)he presence of an existing dispute makes this a live controversy . . . ." 428 U.S. at 403, note 8, 96 S.Ct. at 3145.
 
 
 89
 The importance of the holdings in Buffalo Forge and Carpenters Union is that in each of them the court applied, to disputes between companies and unions, the same mootness rules applicable in the cases in which there appeared a public interest such as the enforcement of a statute. And in both of those cases, which were suits between private parties over the construction of collective bargaining agreements and involving strikes which had ended during the pendency of the actions, the court relied upon cases which had been decided in the context of the presence of a public order, statute, regulation, etc. This leads us to believe that the rules for ascertaining mootness in public interest and private cases should be essentially the same. While it is true that courts may take a longer look at cases involving a public policy, statute, or regulation because of the continuing presence of such, we do not think it is true that different rules are applied. Indeed, since mootness is a jurisdictional principle, no sense of urgency brought about by the application of a public law, etc., should be able to confer jurisdiction on a court where it has ceased.
 
 
 90
 In this respect, we also note that the collective bargaining agreement here in question affects a substantial part of the entire bituminous coal industry in the United States. All signatory operators throughout the country are considered a single bargaining unit. See United Mine Workers, 179 NLRB 479 (1969). The Bureau of Mines weekly coal report of March 18, 1977, for example, shows that West Virginia produces more than 15% of the nation's bituminous coal, 2,086,000 tons in that week. The plan on file in this court for the disposition of criminal cases from the Southern District of West Virginia shows that in fiscal 1975 there were about 300 Boys Market injunction cases in the Southern District of West Virginia alone involving wildcat strikes. So, if the public interest is a sine qua non in determining whether or not the capable of repetition, yet evading review doctrine is to be applied, and we doubt that it is, we think the public has an interest in having decided the questions which have arisen again and again between the parties here and which in the strike involved in these cases directly affected almost the entire bituminous coal industry of the nation.
 
 
 91
 Accordingly, we hold that the questions are not moot. Accord, Atlantic Richfield Co. v. Oil, Chemical and Atomic Workers Int. Union, 447 F.2d 945 (7th Cir. 1971).
 
 VIII
 A.
 
 92
 In each of the cases before us, there is no argument but that, aside from the question of the construction of Buffalo Forge, the necessary prerequisites for the issuance of Boys Markets' injunctions have been met as set out in that opinion, 398 U.S. at page 254, 90 S.Ct. 1583, and no discussion of those various factors is either necessary or appropriate here.
 
 B.
 
 93
 Our principal problem is to construe Buffalo Forge and apply it to the facts of these cases.
 
 
 94
 Certiorari was granted in Buffalo Forge because the Courts of Appeals were divided in their construction of Boys Markets, and the Court set Buffalo Forge in the context of a statement by the Court of Appeals that the strike in that case was not " 'over a grievance which the union has agreed to arbitrate' ". 428 U.S. at 404, 96 S.Ct. at 3145 (1976); 517 F.2d 1206, at 1210 (2d Cir. 1975). In Buffalo Forge, two office and technical workers' locals of the United Steelworkers had been certified to represent the office and technical employees but were unable to consummate their first collective bargaining agreements with the company. They struck and established picket lines, as they had a right to do, in the prosecution of their demands. The office and technical workers' strike and pickets were, of course, a part of a classically legitimate strike. Two other locals of the United Steelworkers, representing the production and maintenance employees of the company, refused to cross the office and technical workers' picket lines. The production and maintenance workers had no separate quarrel with the company, but maintained they had a right to refuse to cross the picket lines despite a no-strike clause in their contracts with the company. The only dispute the company had with the production and maintenance locals was whether or not they had a right to refuse to cross the office and technical locals' picket lines. The contracts of the production and maintenance locals also contained broad arbitration clauses. While the Court held, p. 410, 96 S.Ct. p. 3148, that the issue of whether or not the production and maintenance locals' refusal to cross the office and technical picket lines was arbitrable under the contract: "(c)oncededly, that issue was arbitrable," the Court went on to hold that an injunction should not issue pending arbitration and stated that ". . . it does not follow that the district court was empowered not only to order arbitration but to enjoin the strike pending the decision of the arbitrator . . . ."
 
 
 95
 The Court reasoned that "(n)either its (the strike of the production and maintenance locals) causes nor the issue underlying it was subject to the settlement procedures provided by the contracts between the employer and . . . (the production and maintenance locals)", pp. 407, 408, 96 S.Ct. p. 3147.
 
 
 96
 We think the Court meant to tie together the non-arbitrability of the underlying cause with the cause of the strike at issue so that, when the underlying cause is not subject to arbitration, a refusal to cross a picket line, generated by a strike over the underlying cause, is not a violation of a no-strike clause which is enforceable by injunction against the strike1a although it may be by arbitration. In our opinion, the Court meant thus to restrict the holding of Boys Markets, which many cases had taken to be that if an issue were arbitrable, assuming other conditions were met, an injunction might issue to prevent a strike pending arbitration of the arbitrable issue. Following Buffalo Forge, it seems that where the underlying issue is not arbitrable, then a refusal to cross a picket line set up on account of that underlying issue, although the refusal may be arbitrable, may not be prevented by injunction pending arbitration.
 
 
 97
 Our analysis is supported by note 9 in Buffalo Forge as it deals with the cases of the various circuits which are overruled at least by strong implication. In NAPA Pittsburgh,[2] Altoona Local 110, in a dispute over recognition, picketed the Pittsburgh location where Local 926 was the bargaining agent. The underlying dispute between Local 110 and NAPA Pittsburgh, representation, of course was not arbitrable, especially as between Local 926 and the company. In Island Creek,[3] a dispute arose between Local 680 and Florence Mining Company. Local 680 picketed Island Creek, which had as its local 988, both of the UMW. The nature of the dispute between Local 680 and Florence is not divulged in the opinion, but it is obvious that Island Creek could not have arbitrated an issue between Florence and Local 680. In Armco,[4] the pickets were to protest federal and State allocation of gasoline, a matter obviously not subject to arbitration in any context. In Pilot Freight Carriers,[5] Local 512, from Jacksonville, Florida, was in dispute with Pilot over recognition. On account of that dispute, the employer was picketed at its Kernersville, North Carolina installation, which had as its local 391, both Teamsters Locals. The underlying recognition dispute, of course, was not arbitrable in any context. In Wilmington Shipping Company,[6] employees of the Port Authority struck and picketed the Port of Wilmington. Local 1426 of Wilmington Shipping Company refused to cross the picket line, as it had a right to do if the picket line were bonafide. The dispute was over whether or not the picket line was bonafide, and the parties agreed that this was an arbitrable matter under the contract. It is seen, though, that Wilmington Shipping Company could not have agreed to arbitrate with Local 1426 the underlying dispute between the Port Authority and its employees. In Monongahela,[7] Local 2357 was in a dispute with the employer at Clarksburg over recognition and as a result picketed the employer at Panhandle, which had as its local 2332, both IBEW. It is seen that Local 2332 and the employer could not have arbitrated a dispute over recognition between Local 2357 and the same employer. In Valmac,[8] Local 425 had separate contracts with the employer at four towns in Arkansas. As a result of contract expirations at two of the towns and the resulting dispute, the employer's operations at the other two towns were picketed. The renewals of the contracts, of course, were not subject to arbitration. In Associated General Contractors,[9] Local 110, IBEW, picketed a job site on which the electrical subcontractor was paying lower wages than Local 110 contracts would have provided for had it been on the job instead of Local 84 of the Christian Laborers Association, which had the electrical subcontracting labor. In a suit brought by the general contractor and the mechanical subcontractor against their locals which refused to cross 110's picket lines, it is seen that the underlying dispute, that of the lower wages paid to members of Local 84, was not subject to arbitration between the general and mechanical contractors and their locals.
 
 
 98
 The theme of all of these cases just named, and overruled at least by implication by the Supreme Court in note 9, is that either the underlying dispute was not subject to arbitration at all or at least it was not subject to arbitration by the defendant union and the company. Put another way, the central question to these cases seems to be: Is the object of the strike at hand to compel the company to concede an arbitrable issue?
 
 
 99
 Our conclusion as to the central question in cases such as the ones we have before us is further strengthened by the decisions listed in note 9 of Buffalo Forge as having been correctly decided.
 
 
 100
 In Amstar,[10] the company's installation at Arabi, Louisiana (Meat Cutters Local No. P-1101) was picketed by ILA pickets presumably in furtherance of an economic dispute with Amstar, whose contracts with longshoremen's locals had expired at Brooklyn, Philadelphia, and Boston. The underlying dispute, an economic one over contract expiration, was not arbitrable, of course. In Plain Dealer,[11] the Newspaper Guild was engaged in an lawful economic strike and picketed the paper. The craft unions representing some of the other employees would not cross the picket lines. While neither the district court's opinion nor the per curiam affirmance of the denial of injunctive relief discloses the cause of the underlying strike of the Newspaper Guild, it seems to us doubtful that a lawful economic strike would be arbitrable at all. Thus, Amstar could not concede an arbitrable issue because there was none, and neither could the Plain Dealer.
 
 
 101
 Since the Supreme Court, 428 U.S. at p. 407, 96 S.Ct. 3141, 3147 of Buffalo Forge, has stated, in effect, that Boys Markets is not overruled, "Boys Markets plainly does not control this case," we take it that a correct construction of Buffalo Forge is to limit the application of Boys Markets so that it does not apply in cases where the only dispute between the company and the union is over the meaning or application of the no-strike provision, express or implied, which dispute has been brought about by a dispute which is not arbitrable. The production and maintenance locals' refusal to cross the picket lines in Buffalo Forge was plainly brought about by the dispute between the company and the office and technical locals, which underlying dispute[12] was not arbitrable. So, although the production and maintenance strike obviously was in an effort to compel the company to concede an issue to the office and technical locals, it was not to compel the company to concede an arbitrable issue.
 
 
 102
 We next apply these principles to the controversies between the unions and their respective companies here.
 
 C.
 
 103
 Case No. 76-1793 involving Local 1759 and Cedar Coal Company.
 
 
 104
 The best light that can be put on the strike by Local 1759 is that it commenced over the arbitrator's award in the dispute concerning the communications job and was accentuated by the discharge of the two employees for taking part in that strike. Not only were both of these disputes plainly subject to arbitration, they were in fact arbitrated. Indeed, the union filed a suit in the district court to enforce one of the awards.
 
 
 105
 Extended discussion of this as part of this case is not necessary because of a passage in Buffalo Forge, which is:
 
 
 106
 "Contrary to the Court of Appeals, the employer claims that despite the Norris-LaGuardia Act's ban on federal(-court) injunctions in labor disputes the District Court was empowered to enjoin the strike by § 301 of the Labor Management Relations Act as construed by Boys Markets v. Retail Clerks Union, supra. This would undoubtedly have been the case had the strike been precipitated by a dispute between union and management that was subject to binding arbitration under the provisions of the contract." P. 406, 96 S.Ct. p. 3146.
 
 
 107
 The facts of Local 1759's strike fit squarely into this language, and it is clear that, on the facts alleged in the complaint, the refusal to hear the preliminary injunction was error.
 
 
 108
 We do not think valid the unions' defense that the nature of the strike changed. Their contention is that, following the district court's restraining order, additional causes to those just above set forth were that the company had filed a suit in the federal court to enforce the contract under Boys Markets and that the district court had issued its TRO pursuant to the company's suit. Were we to hold valid a defense in such cases, that the union may strike over the actions a court has taken in its consideration of the matter, such would amount to nothing more nor less than an overruling of Boys Markets by the unilateral act of one of the parties and would abandon completely the function of the courts in these cases as set forth in Boys Markets. It would be just as tenable for a company which had been ordered to arbitrate by a court to refuse to do so as for a union to do the same thing.
 
 D.
 
 109
 Case No. 76-1785, Local 1766 and Cedar Coal Company.
 
 
 110
 Local 1766 is the sister local of Local 1759, and it should be remembered that the dispute between Local 1759 and Cedar commenced this whole controversy. The facts in the complaint, which we must treat as true, allege that the strike of Local 1766 was over the arbitrator's rulings between 1759 and Cedar.
 
 
 111
 While the dispute may not technically have been "over a grievance which both parties are contractually bound to arbitrate," Boys Markets, 398 U.S. p. 254, 90 S.Ct. p. 1594, see Buffalo Forge, 428 U.S. p. 404, 96 S.Ct. 3141, because it is at least arguable that Cedar could not have conceded the arbitrable issue to Local 1766, it rather being engaged in arbitration with Local 1759, we think that construction of Boys Markets is too narrow here. Here, the employer is the same as to both Locals; the collective bargaining agreement is the same; the bargaining unit is the same; the locality of employment is the same; and, most importantly, the purpose of 1766's refusal to cross the 1759 picket lines was not to coerce Cedar into conceding an issue to Local 1759 which was not arbitrable; rather, the purpose of the 1766 strike was to coerce Cedar into conceding an issue to Local 1759 which was admittedly arbitrable. We also bear in mind that under the two-tier arbitration provisions of the collective bargaining agreement, Article XXIII, the award in the 1759 case apparently would affect also Local 1766, for there are only three grounds of appeal to the Arbitration Review Board: that the decision of a panel is in conflict on the same issue with other panels; that the decision involves a new question of a substantial contractual issue; and that the panel decision is arbitrary, etc.
 
 
 112
 We think, then, that since the purpose of the strike of Local 1766 was to compel Cedar to concede an arbitrable issue to Local 1759, with the same employer, the same collective bargaining agreement, the same bargaining unit, and the cause of Local 1759 made its own, the Buffalo Forge exception to Boys Markets should not apply, and assuming the arbitrability of the question of whether or not Local 1766 might be required to cross Local 1759's picket lines, it was error to dismiss the complaint.
 
 E.
 
 113
 Case No. 76-1846, Local 1949 and Southern Ohio Coal Company.
 
 
 114
 The district court, in this case, found that the resulting work stoppage was "one of failure to cross a picket line maintained by other than the members of this particular local union."
 
 
 115
 The court did not find whether the purpose of the strike was merely to express sympathy for Local 1759's position or to require the concession of an arbitrable issue by either Cedar or Southern. But we do not think that a lack of more specific findings should justify reconsideration of that point. In this case, there was no dispute between Southern and Local 1949 which had anything to do with the picket line, or not crossing it, until after the picket line appeared. And, while the refusal to cross the picket line may have been an arbitrable dispute, it was the only dispute between Southern and Local 1949. Even considering that the underlying purpose of 1949's strike may have been to put indirect pressure on Cedar to concede an arbitrable issue to Local 1759, Southern could concede nothing to Local 1759 because it was not bound to it by a collective bargaining agreement, and there was no dispute between Southern and Local 1759.[13]
 
 
 116
 Accordingly, we think the district court correctly denied a preliminary injunction pending arbitration in that case.
 
 IX
 
 117
 This leaves the procedure on remand.
 
 
 118
 Our opinion is a rather narrow one, going only to the denial of injunctive relief pending arbitration in all three cases and in only one, No. 76-1785 (Local 1766) going to the outright dismissal of the complaint.
 
 
 119
 We think the issue of whether Local 1766 might be required to cross Local 1759's picket line was an arbitrable issue, and we think the same should be said of the refusal of Local 1949 to cross the picket line made up of UMW members, not necessarily from Local 1759. On remand, the district courts involved should direct those issues to be arbitrated forthwith, and when such arbitration has been completed, then consider those cases (No. 76-1785, Local 1766) (No. 76-1846, Local 1949) in the light of this opinion.
 
 
 120
 In these same cases involving Locals 1766 (No. 76-1785) and 1949 (No. 76-1846), the arbitration of the matter of whether those locals might be required to cross the picket lines established should be decided by the arbitrators prior to proceeding with the damages aspects of the cases. Drake Bakeries v. Bakery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962); Valmac Industries, Inc. v. Food Handlers, 519 F.2d 263, 269 (8th Cir. 1975), vacated on other grounds, 428 U.S. 906, 96 S.Ct. 3215, 49 L.Ed.2d 1213 (1976).
 
 X
 
 121
 The employees involved in all of these cases are long since back at work and for that reason alone, no presently existing need being shown, in our discretion we deny the request for an injunction pending appeal in case No. 76-1785 (Local 1766).
 
 
 122
 For the same reasons, in our discretion we dissolve the injunction previously issued in case No. 76-1793 (Local 1759), it being obvious that the district courts may grant temporary injunctive relief if otherwise authorized after remand in any of the cases.
 
 
 123
 An injunction pending appeal is denied in case No. 76-1846 (Local 1949) for the reasons expressed in this opinion affirming the denial of injunctive relief by the district court.
 
 XI
 
 124
 It should not be implied that, because injunctions may have been authorized against Locals 1759 and 1766, such are presently required. As to that point, we express no opinion, as we also do not as to the various claims made for permanent injunctive relief and damages.
 
 XII
 
 125
 In case No. 76-1785 (Local 1766), the judgment of the district court is vacated and the case is remanded for action not inconsistent with this opinion.
 
 
 126
 In case No. 76-1793 (Local 1759), the case is remanded for action not inconsistent with this opinion.
 
 
 127
 In case No. 76-1846 (Local 1949), the judgment of the district court is affirmed and the case is remanded for action not inconsistent with this opinion.
 
 
 128
 Paragraph X of this opinion and a separate order this date entered will dispose of case No. 76-8239 (Misc.) concerning the injunction pending appeal in case No. 76-1793 (Local 1759).
 
 
 
 *
 United States Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 **
 United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The district judge adopted a commendable procedure. He heard both motions together and heard oral evidence
 1a Pending arbitration of course.
 
 
 [2]
 NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, 502 F.2d 321 (3rd Cir.), cert. den. 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974)
 
 
 [3]
 Island Creek Coal Co. v. Mine Workers, 507 F.2d 650 (3rd Cir.), cert. den. 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975)
 
 
 [4]
 Armco Steel Corp. v. Mine Workers, 505 F.2d 1129 (4th Cir. 1974), cert. den. 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975)
 
 
 [5]
 Pilot Freight Carriers, Inc. v. Teamsters, 497 F.2d 311 (4th Cir.), cert. den. 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)
 
 
 [6]
 Wilmington Shipping Co. v. Longshoremen, 86 LRRM 2846 (4th Cir. 1974), cert. den. 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974)
 
 
 [7]
 Monongahela Power Co. v. Electrical Workers, 484 F.2d 1209 (4th Cir. 1973)
 
 
 [8]
 Valmac Industries v. Food Handlers, 519 F.2d 263 (8th Cir. 1975), vacated 428 U.S. 906, 96 S.Ct. 3215, 49 L.Ed.2d 1213 (1976)
 
 
 [9]
 Associated General Contractors v. Operating Engineers, 519 F.2d 269 (8th Cir. 1975)
 
 
 [10]
 Amstar Corp. v. Meat Cutters, 468 F.2d 1372 (5th Cir. 1972)
 
 
 [11]
 Plain Dealer Pub. Co. v. Cleveland Typographical Union, 520 F.2d 1220 (6th Cir. 1975)
 
 
 [12]
 See Kentucky West Va. Gas Co. v. Oil, Chemical and Atomic Workers, 549 F.2d 407 (6th Cir. 1977)
 
 
 [13]
 The facts of this case are remarkably similar to Island Creek, supra, which the Supreme Court has indicated was decided wrongly in Buffalo Forge, note 9